Jessie Lee MASTERS, Plaintiff-Appellee,

v.

INDUSTRIAL GARMENTS MANUFAC-
TURING COMPANY, INC.,
Defendant-Appellant.

Supreme Court of Tennessee.

March 17, 1980.

Charles T. Herndon, IV, Johnson City, for defendant-appellant; Herndon, Coleman, Brading & McKee, Johnson City, of counsel.

Howard R. Dunbar, Johnson City, for plaintiff-appellee; Dunbar & Dunbar, Johnson City, of counsel.

## OPINION

BROCK, Chief Justice.

The defendant employer appeals from the decree of the Chancery Court awarding to the plaintiff employee workmen's compensation benefits for 50% permanent partial disability of the body as a whole. The defendant complains that the evidence is insufficient to support the finding of the trial court that (1) she sustained an injury arising out of and in the course of her employment as a seamstress on April 27, 1977, and (2) that the notice provisions of the workmen's compensation laws were satisfied. Other errors are alleged but we do not deem it necessary to consider them.

The plaintiff contends that she suffered an injury to her back while lifting bundles of pants on the job on April 27, 1977, which resulted in pain that caused her to leave the job at about 2:00 p. m. on that date. She testified to that effect and further that early in the morning hours of May 2, 1977, her back pain became so severe that she sought relief at an emergency room of a hospital in Johnson City. She was treated in the emergency room for a kidney infection and after being off from work for several days returned to her job where she continued to work for several months. She sought medical attention from several physicians: Dr. Webb, a general practitioner, Dr. Phil Roe, a gynecologist, Dr. Sam Huddleston, an orthopedic surgeon, Dr. Horace Cupp, a neurosurgeon, Dr. William Kennedy, an orthopedic surgeon and Dr. Ronald Rosenthal, an orthopedic surgeon.

Two witnesses, Shelia Hughes, the plaintiff's union president, and Thelma Banner, the plaintiff's supervisor, testified that on April 27, 1977, the plaintiff complained that lifting the bundles of garments upon which she was working caused pain in her back and that for this reason she needed a "bundle boy" to move the bundles for her. However, neither witness testified that upon this occasion the plaintiff complained of having received an injury of any kind.

It is well settled that except in an obvious case, such as an amputation of a limb or a portion thereof, the employee must establish by expert medical evidence that the injury and disability of which he or she complains was caused by an accident arising out of and in the course of employment. *Mazanec v. Aetna Insurance Company*, Tenn., 491 S.W.2d 616 (1973). It is also well settled that this Court does not weigh the testimony of various witnesses but is limited to ascertaining whether the record contains any credible evidence from which causation may be found.

## I

In the case at bar the plaintiff relies upon the testimony of Dr. Rosenthal for proof of both causation and permanency of her alleged injury. Accordingly, we have carefully examined Dr. Rosenthal's testimony. Dr. Rosenthal examined the plaintiff on one occasion as a consultant at the request of Dr. Roe of Johnson City. Based upon the history given him by the plaintiff and upon x-rays taken of her back and upon his physical examination of the plaintiff, Dr. Rosenthal testified that:

". . . I interpreted this whole x-ray pattern as showing minimal degenerative arthritis, or minimal degenerative joint disease. The terms are synonymous.

"Q. O.K. Did you make any other examination?

"A. No, no. These are the examinations that I did.

"Q. And what diagnosis?

"A. I felt that this represented a chronic lumbosacral strain.

"Q. Now by chronic what do you mean?

"A. The difference between acute and chronic is really more part of the, either the patient's history, or over a period of examinations that you yourself have performed. It did not come on acutely—that is within perhaps a few weeks of the time I saw her.

"Q. By her history it had been there for longer?

"A. Yes.

"Q. Do you have an opinion as to whether or not this is a permanent condition?

"A. I can't say that with certainty, but my experience with this kind of problem has been that it may last for years and years and years, and may very well indeed be permanent. I say this by virtue of the very characteristic discomfort that can be reproduced by either bending or extending and by the x-ray changes which, although minimal, nonetheless are unusual, and I believe abnormal for a 37 year old woman.

"Q. Would you have an opinion as to her permanent medical impairment?

"A. I felt that a permanent residual partial disability of 5% of the whole body would be in order for this patient, assuming, of course, that the injury was indeed, that the problem that I examined her for, was indeed caused by the injury that she described to me in May, 1977.

\* \* \* \* \* \*

"Q. Assuming that her x-rays had revealed degenerative bone disease, or degenerative osteoarthritis, or whatever, immediately after the accident, would it not be fair to say then that that problem existed prior to her alleged accident?

"A. Yes, I expect it would. I expect that these x-ray changes antedated her accident and the accident was superimposing on the changes in her spine.

"Q. Assuming that she did have an accident that she claimed, there is no way to testify with reasonable medical certainty whether or not it was aggravated or not, is there?

"A. The likelihood of someone having prolonged symptoms, particularly in the back, after a bending injury, a twisting injury, a strain that is superimposed on a radiologically abnormal back, the possibility of this injury being greater—that is, being prolonged—is far greater than the possibility of it being prolonged or even permanent in an individual whose back is completely normal radiologically."

The above quoted excerpts from the testimony of Dr. Rosenthal are, in our opinion, adequate to support findings by the trial court that the plaintiff strained her back while lifting bundles of pants on the job and that this strain combined with pre-existing degenerative arthritis of her spine resulting in a pain causing condition which probably will be permanent. Thus, there is medical evidence to support the trial court's

findings of causation and permanency of the injury.

## II

The defendant also contends that the plaintiff employee failed to give notice of injury as required by T.C.A., § 50–1001, which provides as follows:

"Every injured employee or his representative shall, immediately upon the occurrence of an injury, or as soon thereafter as is reasonable and practicable, give or cause to be given to the employer who has not actual notice, written notice of the injury, and the employee shall not be entitled to physician's fees nor to any compensation which may have accrued under the provisions of the Workmen's Compensation Law from the date of the accident to the giving of such notice, unless it can be shown that the employer had actual knowledge of the accident; and no compensation shall be payable under the provisions of this law unless such written notice is given the employer within thirty (30) days after the occurrence of the accident, unless reasonable excuse for failure to give such notice is made to the satisfaction of the tribunal to which the claim for compensation may be presented."

The plaintiff makes no claim that written notice was given, so that, the real inquiry is whether the employer had "actual knowledge of the accident" and injury. The plaintiff contends that material evidence of actual knowledge on the part of the employer is shown by her testimony as follows:

"Q. So what happened to you?

"A. It hurt my back, lifting, it strained it or something when I'd lift them up. It hurt it real bad.

"Q. So what did you do?

"A. I went to Shelia Hughes and asked her to go to our floor lady and get her to get the boy to move the bundles for us.

"Q. Now who is Shelia Hughes?

"A. She's our union president.

"Q. Is this why you went to her?

"A. Yes, Sir, and she works close to me too. She works the next operation.

"Q. O.K., you asked her what?

"A. To go to Thelma Banner or our floor lady.

"Q. Is she your floor lady in charge?

"A. Yes sir.

"Q. And go to her and do what? Report this accident?

"A. Yes Sir.

MR. HERNDON: Well now, I am going to object to that as being leading and suggestive.

THE COURT: Shelia, is that her name? Shelia Hughes?

"A. Yes Sir.

THE COURT: Did you request Shelia Hughes to go to the Banner lady and report this accident?

"A. Yes, I told her to go to Mrs. Banner and tell her that it was hurting my back to lift the bundles like that and ask her to get the bundle boy to move them.

"Q. And did you two ladies go to Mrs. Banner?

"A. Yes Sir we did.

"Q. What did you tell her.

"A. We told her that it was hurting my back to move the bundles, lift them over my head, and she got the bundle boy to move the bundles.

"Q. She got him to start?

"A. Yeah."

Shelia Hughes testified, in pertinent part, as follows:

"Q. . . . She came to me one morning, I think it was in the morning.

"Q. You don't remember the date of course.

"A. No I don't remember the date.

"Q. O.K.

"A. And said that they needed a bundle boy over there that it was hurting her back lifting those bundles. And we went to Thelma Banner, a supervisor, so she sent a bundle boy up there.

"Q. You and Mrs. Masters together? Both of you went to Mrs. Banner?

"A. Yes, I think Jessie was with me; I know I went to her.

"Q. *And you told her? And you told her what now?*

"A. *That they needed a bundle boy up there that they were lifting the bundles and was hurting their back.*

"Q. What did she say or do?

"A. She sent a bundle boy up there. I can't remember the exact conversation but she sent a bundle boy on up there then.

\* \* \* \* \* \*

"Q. Now let me ask you this Miss Hughes. You are familiar with the procedures there at the plant. Anytime somebody has a compensation injury, they are suppose to turn it in so they get sent to the doctor, is that right?

"A. Yes Sir.

"Q. *And when you went to see Miss Thelma Banner, you didn't tell her that Jessie Lee had suffered a compensation injury or anything of that nature; you just said you needed a bundle boy to move them?*

"A. *Move the bundles? Yes Sir.*

"Q. *Is that right?*

"A. *(Nods 'yes.')*" [Emphasis added.]

The witness, Thelma Banner, testified, in pertinent part, as follows:

"Q. And you don't recall, then, specifically her and Mrs. Hughes coming and telling you about her hurting her back on April 27?

"A. No I don't.

\* \* \* \* \* \*

"Q. All right, did she ever report to you that she had sustained an on the job injury?

"A. No, not that I remember.

"Q. Now, Mrs. I believe its Hughes? Mrs. Hughes has stated that Mrs. Masters and she went to you and told you that you needed some additional bundle boys to move the bundles because she couldn't do the work and she thought it was hurt-

ing her back. Is that type of complaint frequent in your plant? Don't the workers do this all the time?

"A. Well, yeah, every day.

"Q. That happens every day?

"A. Right.

"Q. And that does not signify that they've sustained an on the job injury does it?

"A. No.

"Q. *And she never turned in her medical bills or asked you to fill out a first report or told you she'd sustained any type of accidental injury?*

"A. *Not to me. Not to me, she didn't.*

"Q. And you are her supervisor?

"A. Yes Sir." [Emphasis added.]

It is shown elsewhere in the record that the plaintiff had sustained an injury on the job in 1976 and had made a proper report thereof to the employer at that time. It, therefore, cannot be doubted that she was aware of the proper procedure to follow in the event she wished to make a claim or give notice of an alleged on the job injury.

■ In our opinion an employee who relies upon alleged actual knowledge of the employer must prove that the employer had actual knowledge of the time, place, nature and cause of the injury. *Arkansas-Louisiana Gas Company v. Blackwood*, Okl., 456 P.2d 507 (1969); 82 Am.Jur.2d Workmen's Compensation § 453 (1976). As Mr. Special Justice Oliver pointed out in *Aetna Cas. & Sur. Co. v. Long*, Tenn., 569 S.W.2d 444, 449 (1978):

" 'The reasons for the requirement as to notice of injury are to give the employer an opportunity to make an investigation while the facts are accessible, and also to enable him to provide timely and proper treatment for the injured employee.' 82 Am.Jur.2d, Workmen's Compensation § 443, p. 209. See also: *York v. Federal Chemical Co., supra*, 188 Tenn. [63] at pages 66 and 67, 216 S.W.2d 725 to the same effect."

■ It is our conclusion that the fair import of the above quoted testimony in behalf of the plaintiff upon the issue of

actual knowledge is that she was calling upon her labor union representative and superior for the assistance of a "bundle boy" because the work of lifting the bundles was too strenuous for her and that this testimony did not convey any idea that she was giving notice of, or making a claim of, an injury or an accident. She did not seek first aid treatment or ask to be permitted to visit a physician or a medical facility; she merely asked for the help of a "bundle boy." In order for a communication to constitute either written notice or actual knowledge on the part of the employer it must be calculated to reasonably convey the idea to the employer that the employee claims to have suffered an injury arising out of and in the course of her employment. The present record contains no material evidence of such a communication at any time before the actual filing of a suit in court many months after the alleged accident occurred. We, therefore, conclude that the plaintiff has failed to satisfy the notice requirements of the statute above set out and that the judgment in her favor must be reversed and her suit dismissed.

Costs are taxed against the plaintiff.

COOPER, HENRY HARBISON, JJ., and McLEMORE, Special Judge, concur.